

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-17-00391-CR

Richard Luis **AMEZQUITA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CR0622
Honorable Mary D. Roman, Judge Presiding[1]

Opinion by:    Irene Rios, Justice

Sitting:    Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice
Irene Rios, Justice

Delivered and Filed:  June 13, 2018

AFFIRMED

A jury found Richard Amezquita guilty of the offense of murder for the shooting death of

Kerry O'Toole.  Based upon the jury's recommendation, the trial court sentenced Amezquita to

sixty years' imprisonment.  On appeal, Amezquita challenges the sufficiency of the evidence

supporting his conviction and contends the trial court erred by admitting evidence of extraneous

offenses and bad acts in violation of Texas Rule of Evidence 404(b).  We affirm.

---

[1] The Honorable Jefferson Moore presided over the guilt/innocence phase of the trial, and the Honorable Mary Roman presided over sentencing.

## BACKGROUND

At approximately 4:45 p.m. on November 7, 2015, Amezquita called 9-1-1 to report he had been assaulted. Amezquita told the 9-1-1 operator a man, later identified as O'Toole, assaulted him and threw rocks at him and his vehicle. Amezquita related to the 9-1-1 operator that after he approached O'Toole's home and rang the doorbell, O'Toole "got belligerent" and yelled and cursed at him. According to Amezquita's report to the 9-1-1 operator, O'Toole hit and choked him before chasing him to his vehicle, throwing rocks. Amezquita further told the 9-1-1 operator that O'Toole "kept going after" him through the vehicle's open window. Amezquita informed the 9-1-1 operator that he "had to shoot" O'Toole "to keep him away." At the time he made the 9-1-1 call, Amezquita was "around the corner" from O'Toole's residence. At the operator's direction, Amezquita drove to the neighborhood clubhouse to meet with dispatched officers.

O'Toole's neighbor, Vicki McIntosh, heard three gunshots after 4:00 p.m. that afternoon. "Not even a minute" after hearing the shots, McIntosh went outside through her front door, which faced O'Toole's house. McIntosh "didn't see any commotion or anything" but she did see a nicely-dressed man, later identified as Amezquita, standing near a car across the street. Although McIntosh knew she heard gunshots, she did not suspect anything out of the ordinary because Amezquita "was just on his phone." Amezquita did not appear disheveled.

That afternoon, Robert Martinez was hosting his child's birthday party at the neighborhood clubhouse. Martinez and a guest were talking outside when they heard four to five gunshots. When Martinez went back inside the clubhouse, his wife told him an uninvited person, later identified as Amezquita, went into the clubhouse and then into the restroom. Martinez entered the restroom to inform Amezquita he needed to leave the private party. Amezquita was speaking on the phone while in the restroom. Amezquita exited a stall, washed his hands, and continued speaking on the phone. According to Martinez, Amezquita told whoever he was speaking to that

he had been assaulted. Martinez did not see any injuries on Amezquita, and Amezquita did not appear disheveled. Martinez described Amezquita as concerned or "a little distraught" but calm and not panicked, angry, or violent. Martinez also noticed what "looked like a hail dent on the side" of Amezquita's car, which Martinez heard Amezquita tell police was caused by a thrown rock.

San Antonio Police Department (SAPD) Officer James Van Kirk was dispatched for a "shooting-in-progress" call. When Officer Van Kirk arrived at the neighborhood clubhouse, Amezquita was speaking on the phone and standing next to his vehicle, which was parked outside the clubhouse. When Officer Van Kirk approached Amezquita, Amezquita continued speaking on the phone. Officer Van Kirk described Amezquita as "pretty calm" and "put together." According to Officer Van Kirk, Amezquita did not appear disheveled, his clothes were not soiled, and "[i]t didn't look like anything was out of place." Officer Van Kirk also did not observe any injuries on Amezquita.

Amezquita informed Officer Van Kirk he called 9-1-1 and repeated what he had told the 9-1-1 operator — that he was assaulted by a belligerent homeowner who attacked him. Amezquita told Officer Van Kirk the homeowner punched and pushed Amezquita and knocked off his hat, glasses, and Bluetooth earpiece. Amezquita related to Officer Van Kirk that he went back to his vehicle, but that the homeowner threw a rock that hit the vehicle. Amezquita also told Officer Van Kirk he was hit in the face with a rock thrown by the homeowner. Amezquita further told Officer Van Kirk he was inside his vehicle when the homeowner attempted to attack him through the open passenger window. Amezquita admitted to shooting at the homeowner, but told Officer Van Kirk he did not know whether the homeowner had been hit.

Officer Van Kirk patted down Amezquita, who did not have any weapons on him. The gun used in the shooting was recovered from Amezquita's vehicle. Crime Scene Investigator (CSI) David Sarabia later found four shell casings in Amezquita's vehicle.

Simultaneous to Amezquita's call to 9-1-1, SAPD Officer Richard Dominguez responded to an alert tone indicating a shooting had occurred. When Officer Dominguez arrived at the location, he did not immediately find any indication of a shooting. Officer Dominguez spoke with McIntosh, who pointed Officer Dominguez in the general direction from where she had heard the shots. Upon further investigation, Officer Dominguez located the victim, who he later identified as the homeowner Kerry O'Toole. Officer Dominguez observed droplets of blood and shattered glass, as well as small bloodstains in the home. Officer Dominguez testified it appeared there was at least one bullet hole in the front door. CSI Eugene Jones later recovered a Bluetooth earpiece from near O'Toole's hand.

When he was informed of Amezquita's version of events, Officer Dominguez searched for rocks in the street. According to Officer Dominguez, however, he found only one "good sized rock" in the street. State's Exhibit No. 9, a photograph taken by Detective Analisa Chavez, showed rocks near the bushes at the front of the house. Detective Chavez, however, did not observe any rocks "right by the front door." An exhibit introduced by Amezquita during Detective Chavez's testimony depicted a rock on the sidewalk "across the street from the house."

CSI Diane Tritley photographed Amezquita's body and hands after he was transported to the police department. CSI Tritley observed some redness on Amezquita's ear, but she did not observe that Amezquita had any injuries. CSI Tritley further did not observe any signs Amezquita had been choked, punched, or hit in the face with a rock.

CSI Robert Ross later completed an analysis of the bullet trajectory evidence. Based upon CSI Ross's analysis, he determined Amezquita shot at O'Toole from the porch or the stairs leading

to the porch. According to CSI Ross, the vertical trajectory did not support a theory that the shooting occurred from a vehicle across the street.

Amezquita's expert witness Robert Ernest, the laboratory director for Allied Forensics Laboratory, also completed a bullet trajectory analysis and testified during trial. Ernest examined physical evidence and photographs of the scene, and concluded "given the physical evidence in this case, it sounds more like [Amezquita's] story that he fired these rounds from inside his car out at the street toward the front door" than from the front porch as the State suggested. According to Ernest, the analysis method used by CSI Ross for determining bullet trajectory and recreating the shooting scene was insufficient, given the scene's variables — particularly how far open the front door was at the time of the shooting.

Michael Paul, a hail damage repairman, testified the damage to the right quarter panel of Amezquita's vehicle was consistent with damage caused by a thrown rock. On cross-examination, Paul admitted he did not know how the vehicle damage occurred. Paul testified the damage was made with a lot of force, but he could not say "only" a rock could have caused the damage.

### ADMISSION OF EXTRANEOUS OFFENSE AND BAD ACT EVIDENCE

In his first issue, Amezquita contends the trial court erred by admitting testimony and evidence that he possessed brass knuckles and a knife[2] in his vehicle at the time of the shooting over objection and in violation of Texas Rules of Evidence 404(b).

### The Trial Record

During Amezquita's opening statement, counsel for Amezquita told the jury that Amezquita called 9-1-1 following the shooting to report he had been assaulted. Counsel informed

---

[2] We note that we have found no authority, nor does Amezquita point us to any, standing for the proposition that the mere possession of a knife, without more, is evidence of other crimes, wrongs, or acts under Rule 404(b). *See* TEX. PENAL CODE ANN. § 46.05 (West Supp. 2017) (listing prohibited weapons).

the jury: "The question, ladies and gentlemen, is: Why, how, when, and what created a situation where a person, as the State said, uses a weapon against an individual who he is there as a licensed security salesman knocking on doors to end up with the death of Mr. O'Toole?" Counsel explained to the jury: "A confrontation took place on the porch. Apparently, it escalated, and it ended up in a tragic loss of life. Why? Again, when, where, and how are the issues that are before you today." Finally, counsel asked the jury to "[t]hink about what would cause a person who is a salesperson who knocks on a door to draw a gun and end up having to shoot the very person that he was there to sell a system to."

Later, during the presentation of the State's case, the jury heard the audio recording of the 9-1-1 call Amezquita made, during which Amezquita told the 9-1-1 operator he had been assaulted by a man who threw rocks at him and that he "had to shoot [at O'Toole] to keep him away" because he "feared for [his] life." The jury also viewed a video recording of Officer Van Kirk's first encounter with Amezquita. In the video, Amezquita can be heard telling Officer Van Kirk much the same summary of events he told the 9-1-1 operator. Amezquita reiterated O'Toole assaulted him and that he "had to shoot at him because he was coming at me."

During the testimony of CSI Sarabia, the State offered State's Exhibit No. 40, a picture of the knife CSI Sarabia testified was recovered from Amezquita's vehicle. Amezquita objected to the admission of the photograph, arguing the photograph of the knife was being "offered for aggravation and not for … furtherance of this crime." The trial court overruled the objection but gave the jury a limiting instruction as requested by Amezquita, advising the jurors that the "knife is not for the purpose of proving the murder at all. So you have to limit your deliberations about that knife when you see that. … [Y]ou are not to consider that as far as the actual charge that is on the indictment, that knife." Amezquita's trial counsel did not object to the limiting instruction and stated "it is sufficient."

The State later offered State's Exhibit No. 50, which was the knife depicted in State's Exhibit No. 40, and State's Exhibit No. 53, brass knucklea. Amezquita objected to both exhibits, arguing "[T]hey constitute[d] uncharged misconduct and [had] no relevance to the instant offense, [and were] only offered for purposes of emotion and not for the crime." The trial overruled the objections, admitted the exhibits, and again gave the jury a limiting instruction:

> And so, in regards to State's Exhibit[s] 40, 50, and 53, the knife and the brass knuckles and the photograph of the knife, I'm allowing that into evidence, but I'm instructing you that you can only consider it for limited purposes. You cannot use those items as far as determining whether the offense that is listed in the indictment, whether those items were part of that offense or not. I'm allowing it for the purpose of the testimony of the witness, as to what he found in the car, but I do not want you deliberating about those items as far as whether the offense charged was committed or not.

Amezquita's trial counsel again did not object to the limiting instruction.

## Discussion

Assuming arguendo that the trial court erred by admitting the complained-off evidence, we conclude the error did not affect Amezquita's substantial rights. *See Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007) (recognizing that the erroneous admission of evidence is non-constitutional error); TEX. R. APP. P. 44.2(b) (a non-constitutional error must be disregarded unless it affects a defendant's substantial rights).

### *Standard of Review*

We "will not overturn a criminal conviction for non-constitutional error if [we], after examining the record as a whole, [have] fair assurance that the error did not influence the jury, or influenced the jury only slightly." *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011) (quoting *Schultz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001)) (emphasis in original). We focus "not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect or influence on the jury's verdict." *Id.* at 93-94. We will

reverse the conviction for non-constitutional error, only if we have grave doubt that the trial result was free from the substantial effect of the error. *Id.* at 94. "'Grave doubt' means that 'in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" *Id.* (quoting *Burnett v. State*, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002)).

When assessing whether the jury's decision was improperly influenced, we "must consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case." *Id.* We "may also consider the jury instruction given by the trial judge, the state's theory, defensive theories, closing arguments, voir dire, and whether the state emphasized the error." *Id.*

*Analysis*

In his opening statement, Amezquita specifically asked the jury to consider what would make someone in his position shoot a person to whom he was hoping to make a sale. Later, during the State's case, prior to the admission of the complained-of evidence, the jury viewed the COBAN (dash cam) video and heard the 9-1-1 call made by Amezquita, in which Amezquita admitted to shooting at O'Toole. In the recordings, Amezquita claimed that O'Toole choked and chased him and threw rocks at him. Amezquita specifically told the 9-1-1 operator and responding officers he had been assaulted before running to his vehicle. According to Amezquita's description on the recordings, O'Toole continued to attempt to hit or attack Amezquita with rocks through the vehicle's open windows. According to Amezquita's own words, he "had to shoot."

Therefore, the fact that Amezquita shot and killed O'Toole was uncontested. The issues, as pointed out during Amezquita's opening statement, were the nature of the interaction between

Amezquita and O'Toole, which man was the aggressor, and whether Amezquita's resort to gunfire was reasonable.

When the complained-of evidence was admitted, the trial court provided the jury with limiting instructions regarding the evidence, which was not repetitious and did not consume an inordinate amount of time. Further, that was the only mention of the complained-of evidence until the State's final closing argument, when the State argued, without objection, that the presence of the knife and brass knuckles was evidence of reasonable alternatives to Amezquita using a gun. The State's argument was made in response to Amezquita's argument that he was justified in shooting O'Toole. However, to rebut Amezquita's self-defense theory, the State also presented evidence from several witnesses who saw Amezquita before and after the shooting, as well as witnesses who testified regarding the state of the crime scene and bullet trajectory analysis.

Considering the evidence as a whole, we conclude that the evidence supporting the jury's verdict was strong and whether the complained-of evidence was admitted does not strengthen or detract from that evidence. Given the nature of the testimony and evidence presented at trial, we have fair assurance that the jury's knowledge that a knife and brass knuckles were in Amezquita's vehicle at the time of the shooting did not influence the jury, or influenced the jury only slightly. Thus, because the error, if any, did not have a substantial and injurious effect or influence in determining the jury's verdict, it did not affect Amezquita's substantial rights. Accordingly, the trial court's error, if any, was harmless.

Amezquita's first issue is overruled.

### SUFFICIENCY OF THE EVIDENCE

In his second issue, Amezquita contends "[t]he evidence is legally insufficient to prove the offense beyond a reasonable doubt" and "the jury reached inculpating conclusions based on pure speculation." Amezquita argues this cause should be reversed and remanded because when he

used deadly force, it was in the face of apparent danger and he was in fear of imminent serious bodily injury or death.

### Standard of Review and Applicable Law

To prevail on a claim of self-defense with the use of deadly force, a defendant must prove: (1) he would have been justified in using force against the other person; and (2) it was reasonable to believe that "deadly force [was] immediately necessary [for protection] against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a)(1), (2)(A) (West 2011). "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* at § 9.31(a).

Once a defendant produces some evidence raising the issue of self-defense, the State bears the burden of persuasion to show beyond a reasonable doubt that the defendant's actions were not justified. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). To meet its burden of persuasion, the State is not required to produce additional evidence. *Saxton*, 804 S.W.2d at 913. If the jury finds the defendant guilty, it has made an implicit finding against any defensive theory raised by the defendant. *Id.* at 914.

When a defendant challenges the legal sufficiency of the evidence to support the jury's implicit rejection of his self-defense claim, we do not look to whether the State presented evidence that refuted defendant's self-defense evidence. *Id.* Instead, we determine whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have found against defendant on the self-defense issue beyond a reasonable doubt. *Id.* In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight given to their testimony. *Carey v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016).

The jury is free to accept or reject any and all defensive evidence. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012); *Saxton*, 804 S.W.2d at 914. Further, we defer to the jury's resolution of any conflicts in the evidence. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

**Discussion**

The jury was charged that Amezquita committed the offense of murder if he intentionally or knowingly caused O'Toole's death by shooting O'Toole with a deadly weapon (a firearm) or if Amezquita, with the intent to cause serious bodily injury to O'Toole, committed an act clearly dangerous to human life that caused O'Toole's death by shooting O'Toole with a deadly weapon (a firearm). The evidence is undisputed that Amezquita shot O'Toole, which was an act clearly dangerous to human life, and O'Toole died as a result. Accordingly, the evidence establishes every essential element of the offense of murder beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914. We next examine whether the jury also could have found against Amezquita on the self-defense issue beyond a reasonable doubt. *Id*.

Amezquita points to his expert witness's testimony regarding the scene recreation and bullet trajectories. Amezquita argues that because Ernest's conclusion differs from that given by CSI Ross, the jury must have engaged in pure speculation to find him guilty of murder and reject his claim of self-defense. The jury had more evidence than just Ernest's and CSI Ross's testimony before it.

The jury heard the audio recording of Amezquita's 9-1-1 call and viewed the COBAN video recording of Amezquita's initial interaction with officers. Amezquita stated O'Toole assaulted him by pushing, punching, and choking him. Amezquita also stated he had to shoot at O'Toole because after throwing rocks at Amezquita, O'Toole attempted to attack Amezquita through the open passenger window of Amezquita's vehicle. The jury heard testimony that apart from some redness on Amezquita's ear, the witnesses did not observe any injuries on Amezquita.

Further, the jury heard testimony that immediately following the altercation and shooting, Amezquita did not appear disheveled. Additionally, the jury heard testimony that officers found one rock in the street and one rock on the sidewalk across the street. Also, the jury heard from O'Toole's neighbor, who stepped outside her home immediately after hearing the gunshots and saw Amezquita standing outside his vehicle and speaking on the phone. However, the neighbor did not observe any signs of a commotion in the area or that Amezquita appeared unkempt. Officer Dominguez, who found O'Toole's body, testified he discovered O'Toole lying on his back inside the house "roughly 15 feet" from the front door. Officer Dominguez further testified he did not see any signs of a struggle. Finally, Ernest's testimony did not speak to the issue of self-defense. At best, Ernest's testimony regarding from where Amezquita fired the shots that killed O'Toole conflicted with that presented by the State.

After viewing all the evidence in the light most favorable to the prosecution, we conclude that a rational jury could have found the essential elements of the charged offense beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914. We further conclude, that a rational jury could have found against Amezquita on the self-defense issue beyond a reasonable doubt. *Id.*

Issue two is overruled.

## CONCLUSION

Based on the foregoing reasons, we affirm the judgment of the trial court.

Irene Rios, Justice

DO NOT PUBLISH